UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| KYLE ELLISON<br><br>*Plaintiff*<br><br>VERSUS<br><br>MARQUETTE TRANSPORTATION COMPANY GULF-INLAND, LLC<br><br>*Defendant* | CIVIL ACTION NO. 2:23-CV-1849<br><br>SECTION: G; DIVISION: 1<br><br>JUDGE: BROWN<br><br>MAGISTRATE: DOSSIER |

**MEMORANDUM IN SUPPORT OF MOTION *IN LIMINE* TO EXCLUDE CERTAIN TESTIMONY AND OPINIONS OF G. RANDOLPH RICE, PLAINTIFF'S ECONOMIC LOSS EXPERT**

**MAY IT PLEASE THE COURT:**

Defendant, Marquette Transportation Company Gulf-Inland, LLC ("Marquette"), respectfully submits this Memorandum in Support of its Motion *in Limine* to Exclude Certain Testimony and Opinions of G. Randolph Rice, Plaintiff's Economic Loss Expert.[1]

**SUMMARY OF THE ARGUMENT**

This is a Jones Act personal injury action, which is set to proceed to a bench trial on September 16, 2024.[2] Plaintiff, Kyle Ellison has retained G. Randolph Rice ("Rice'), an economist, to offer various opinions and testimony as an expert in economic loss. Notwithstanding the foregoing, Rice intends to offer improper wage loss calculations that do not adhere to the mandates of *Culver v. Slater Boat Co.*, 722 F.2d 114 (5th Cir. 1983) (en banc) (hereinafter "*Culver II*") and its required methodology. Namely, Rice utilizes an improper base wage rate in calculating Plaintiff's past and future economic losses, thereby resulting in an inflated economic loss figure.

[1] Exhibit 1, Rice's Expert Report.
[2] R. Doc. 14, at p. 5.

Accordingly, for the reasons set forth more fully herein, this Court should preclude Rice from offering any improper opinions with respect to the calculation of Plaintiff's past and future wage loss.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. The Alleged Incident and Procedural History

This is a Jones Act personal injury case. Marquette employed Plaintiff, Kyle Ellison ("Plaintiff") as a deckhand aboard the M/V ST PEREGRINE. Plaintiff did not sleep aboard the vessel, but instead left after each 12-hour shift to return home. At the time of his incident, Plaintiff made $170 per day working as a deckhand for Marquette.[3] He worked a 10 day on and 5 day off hitch. Prior to working for Marquette, Plaintiff worked as a roofing salesman and earned between $72,000 to $96,000 (pre-tax) annually.[4] Nevertheless, Plaintiff voluntarily chose to work as a deckhand for Marquette earning less than his previous employment positions.

On or around June 5, 2020, Plaintiff reported to Marquette shoreside personnel that he suffered from a left swollen leg, but that said leg issue had occurred while at home. Plaintiff did not report any barge collision accident or incident to Marquette shoreside personnel. Thereafter, sometime in late July 2020, Plaintiff reported that his left swollen leg occurred as a result of Plaintiff working long hours on his feet aboard the ST PEREGRINE. Again, Plaintiff never reported any specific accident or incident to Marquette personnel. Now, in his instant lawsuit, Plaintiff alleges that he injured his left leg and low back as a result of a "collision" between barges that occurred on June 5, 2020.[5] Marquette denies any liability for Plaintiff's alleged incident.

---

[3] Exhibit 2, Position Rate Change Form; Exhibit 3, Plaintiff's Check History Report.
[4] Exhibit 4, Plaintiff's Answers to Interrogatories, Answer to Interrogatory No. 2.
[5] R. Doc. 1, at p. VI.

Following the alleged incident, Plaintiff filed suit against Marquette and brought the typical tripartite causes of action available to a seaman: (1) Jones Act negligence; (2) unseaworthiness; and (3) maintenance and cure.[6] A bench trial is currently scheduled to begin September 16, 2024.[7] In pertinent part, Plaintiff seeks damages for past and future wage loss or diminution of earning capacity.[8]

## II. Rice's Report and Improper Calculations

In connection with his lawsuit, Plaintiff has retained G. Randolph Rice ("Rice"), an economist, to provide calculations of Plaintiff's economic losses arising from the alleged incident. Rice issued his expert report on May 13, 2024.[9] In pertinent part, Rice purports to calculate Plaintiff's alleged economic losses by assuming an annual "pre-accident wage earning capacity of $75,400.19" and post-accident wage earning capacities ranging between $0 to $60,462.22:

1. Present day value of Kyle Ellison's past lost wages, and loss of wage earning capacity from June 5, 2020, to present [trial] based on a pre-accident wage earning capacity of $75,400.19, and a post-accident wage earning capacity of (a) $0,00, (b) $32,094.94, (c) $39,344.45, and (d) $60,462.22.

Utilizing a base wage rate of $75,400.19, Rice has calculated that Plaintiff suffered $307,575.00 in past lost wages, assuming Plaintiff has not returned to work in any capacity between the date of his alleged accident on June 5, 2020 and the date of trial.[10] Next, Rice, then assumes that Plaintiff did return to work post-accident earning between $32,094.94 to $60,462.22, thereby resulting in a past wage loss range of $56,598.00 to $307,575.00:[11]

---

[6] R. Doc. 1.
[7] R. Doc. 14, at p. 5.
[8] R. Doc. 1, at p. 4, ¶ IX.
[9] Exhibit 1, Rice's Expert Report.
[10] As per Plaintiff's Answers to Interrogatories, Plaintiff did indeed return to the workforce, earning more than he did while working for Marquette.
[11] Exhibit 1, Rice's Report, at p. 2.

**Results**: After tax earnings, 6/05/2020-9/16/2024, at annual earnings of $75,400.19 total **$307,575.00**. An "offset" of (a) $0.00 is apparent. For the other "offsets," the results are:

(b) $32,094.94: After-Tax Earnings, 6/05/2020-9/16/2024 = $135,114.00

"Loss": $307,565.00 less $135,114.00 = **$172,451.00**

(c) $39,344.45: After-Tax Earnings, 6/05/2020-9/16/2024 = $164,941.00

"Loss": $307,565.00 less $164,941.00 = **$142,624.00**

(d) $60,462.22: After-Tax Earnings, 6/05/2020-9/16/2024 = $250,967.00

"Loss": $307,565.00 less $250,967.00 = **$56,598.00**

As for future lost wages, again utilizing a pre-accident earning capacity of $75,400.19, Rice calculates that Plaintiff's future lost wages amount to $1,151,650.00, assuming that Plaintiff cannot return to work in any capacity. Thereafter, Rice assumes that if Plaintiff can return to work earning between $32,094.96 to $60,462.22, his future lost wages will range between $216,735.00 to $640,035.00.[12]

In short, utilizing a base wage rate of $75,400.19, Rice has calculated that Plaintiff's past lost wages range from $56,598.00 to $307,575.00 and that his future lost wages range from $216,735.00 to $1,151,650.[13]

The fundamental flaw, however, with all of Rice's calculations is his utilization of a base wage rate of $75,400.19. As noted herein, at the time of Plaintiff's alleged accident, he earned $170 per day as a deckhand for Marquette, which would annualize to approximately $35,000 per year.[14] By utilizing a base wage rate almost twice Plaintiff's gross earnings at the time of his injury,

[12] *Id.*, at pp. 2-3.
[13] *See* Exhibit 1.
[14] Exhibit 5, Malcolm M. Dienes Expert Report.

Rice has improperly inflated Plaintiff's economic losses. As explained more fully herein, the calculation of past and future lost wages, must begin with the seaman's gross earnings at the time of the injury. Rice has ignored this fundamental principle, and, as such, his opinions and proposed economic loss calculations run afoul of *Culver II* and *Daubert*. Accordingly, Rice's improper wage loss calculations must be excluded from the trial of this matter.

## LAW AND ARGUMENT

### I. *Daubert* Standard

Rule 702 of the Federal Rules of Evidence governs the admissibility of proffered expert testimony. Rule 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. *See Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 588 (1993); *United States v. Hitt*, 473 F.3d 146, 158 (5th Cir. 2006).

"The Supreme Court's landmark case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, provides the analytical framework for determining whether expert testimony is admissible under Rule 702 of the Federal Rules of Evidence." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 (5th Cir. 2002) (citing *Daubert*, 509 U.S. 579). Under *Daubert*, the Court acts as a gate-keeper and conducts a preliminary assessment to "determine whether the expert testimony is both reliable and relevant." *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). When the admissibility of expert testimony is challenged under *Daubert*, the proponent of the evidence bears the burden of proving

that the testimony is both relevant and reliable. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *Mathis v. Exxon Corp.*, 302 F.3d 448, 460–61 (5th Cir. 2002) (citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)). *See also Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012). Here, Plaintiff bears the burden of establishing both relevancy and reliability.

With respect to relevancy, the proposed testimony must be relevant "not simply in the way all testimony must be relevant . . . , but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue." *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003). The Fifth Circuit has explained:

> There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.

*Vogler v. Blackmore*, 352 F.3d 150, 156 n.5 (5th Cir. 2003) (quoting FED. R. EVID. 702 advisory committee's note). Likewise, the reliability inquiry requires the court to assess whether the reasoning or methodology underlying the expert's testimony is valid. *Daubert*, 509 U.S. at 589. District courts rely upon a myriad of non-exclusive factors when determining the reliability of an expert's testimony. These factors include: (1) whether the technique has been tested; (2) whether the technique has been subjected to peer review and publication; (3) the technique's potential error rate; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique is generally accepted in the relevant scientific community. *Burleson v. Tex. Dept's of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004). The determination of whether an expert's testimony is reliable is a fact-specific inquiry. *Skidmore v. Precision Printing and Pkg., Inc.*, 188 F.3d 606, 618 (5th Cir. 1999).

## III. *Culver II* and the Below-Market-Discount Method

When properly plead and proven, under the General Maritime Law, a seaman may recover past lost earnings and loss of future earning capacity. In the seminal case of *Culver v. Slater Boat Co.* (hereinafter "*Culver II*"), the U.S. Fifth Circuit established the method for calculating lost wages in maritime cases. 722 F.2d 114 (5th Cir. 1983) (en banc). In *Culver II*, the Fifth Circuit fixed a four-step process for determining lost wages: (1) estimate the loss of work life or expected remaining work-like of the plaintiff; (2) calculate the lost income stream; (3) compute the total lost income stream; and (4) discount the total to present value. *Id.*, at 117. *See also Nelson v. Cooper T. Smith Stevedoring Co.*, C.A. No. 12-2890, 2013 U.S. Dist. LEXIS 123876 (E.D. La. Aug. 28, 2013) (Vance, J.). This is known as the "below-market-discount method."

When calculating lost wages, the calculation of the lost income stream "**begins with the gross earnings of the injured party at the time of the injury**." *Id.*, at 117 (emphasis added). *See Martinez v. Offshore Specialty Fabricators, Inc.*, 481 F. App'x 942, 950 (5th Cir. 2012) (reaffirming that lost wages should be calculated based upon the plaintiff's gross earnings at the time of injury); *Hernandez v. M/V RAJAAN*, 841 F.2d 582, 587-88 (5th Cir. 1988) ("*Culver II* requires the court to use the plaintiff's gross earnings at the time of the injury."). Nonetheless, because the court "cannot ignore the reality of inflation," in *Culver II*, the court established the method by which to determine the effect of inflation on a seaman's future earnings. *Id*. at 118-122. In evaluating the issue, the Fifth Circuit definitively held that, absent a stipulation to the contrary, the method to be used in adjusting damage awards to account for inflation would be the below-market-discount method. The court explained:

> In the below-market-discount method, the fact-finder does not attempt to predict the wage increases the particular plaintiff would have received as a result of price inflation. Instead, the trier of fact estimates the wage increases the plaintiff would have received each year as a result of all factors other than inflation. The resulting

> income stream is discounted by a below-market discount rate. This discount rate represents the estimated market interest rate, adjusted for the effect of any income tax, and the offset by the estimated rate of general future price inflation.

*Id*. at 118 (emphasis added).

Because "[n]o one can accurately predict the course of future inflation," the Fifth Circuit commanded fact-finders to adjust damage awards to account for inflation according to the below-market-discount method. *Id*. at 119. The court noted that the parties may stipulate the below-market-discount rate, but if they are unable to do so, they may introduce expert testimony concerning the appropriate rate. Nonetheless, *Culver II* makes clear that, "[o]ther evidence about the price of inflation is inadmissible." *Id.* at 122 (emphasis added). Evidence concerning the likelihood that the earnings of an injured worker would increase "due to personal merit, increased experience and other individual and societal factors" can still be considered, if appropriate under the facts and evidence of the case. *Id*. at 122.

*Culver II* sought to prevent the average injury case from becoming a graduate seminar on economic forecasting by excluding from evidence earnings that are "so speculative that they cannot be accurately determined." *Id.* at 120. With respect to future earnings, "[t]he paramount concern of a court awarding damages for lost future earnings is to provide the victim with a sum of money that will, in fact, replace the money that he would have earned." *Culver II*, at 120. Thus, courts "commonly exclude many relevant factors from consideration on the basis that they are ***so speculative*** that they cannot accurately be determined." *Id*. (emphasis added). Likewise, "an award for damages cannot stand when the evidence to support it is speculative or purely conjectural." *Masinter v. Tenneco Oil Co*., 929 F.2d 191, 194 (5th Cir. 1991). Accordingly, evidence of increases in earnings cannot be speculative. *Martinez v. Offshore Specialty Fabricators, Inc.*, 481 F. App'x 942 (5th Cir. 2012) (reaffirming that calculation of lost wages begins with plaintiff's

gross earnings at the time of the injury and awards for lost wages cannot be based upon speculation of conjecture).

**IV. <u>Rice's calculations utilizing an improper base wage rate must be excluded.</u>**

The law is clear that the calculation of lost income begins with the gross earnings of the plaintiff at the time of the injury. *Culver II*, at 117; *Martinez v. Offshore Specialty Fabricators, Inc*., 481 F. App'x 942, 950 (5th Cir. 2012). At the time of Plaintiff's alleged injury, he earned $170 per day as a deckhand, annualizing to approximately $35,000 per year. Despite this undisputed fact, Rice has improperly utilized a base wage rate more than twice Plaintiff's gross earnings, thereby improperly inflating his economic losses. Rice has presumably looked to Plaintiff's earnings **prior to working for Marquette** in arriving at his inflated base wage rate, however, *Culver II* demands that wage loss be calculated utilizing the gross earnings of the plaintiff-seaman at the time of the injury. Plaintiff chose to work in the maritime industry and chose to become a deckhand earning less than his prior professions. Plaintiff cannot now inflate his economic losses utilizing his past higher earnings against the mandates of *Culver II*.

Rather, Plaintiff's alleged economic loss, if any, should be calculated using his earnings at Marquette at the time of the injury – not speculative and conjectural higher earnings based upon his career trajectory prior to joining the maritime industry and becoming a deckhand. Rice's proposed opinions and testimony utilizing an improper base wage rate run afoul of this well-established mandate and should be excluded from the trial of this matter.

**CONCLUSION**

Rice has improperly calculated Plaintiff's past and future wage loss against the mandates of *Culver II*. Rather than utilize his gross earnings at the time of the alleged injury, Rice has used Plaintiff's earning capacity prior to his employment with Marquette. Such calculations are

improper and defy *Culver II* and its instructions. Accordingly, for the aforementioned reasons, Rice's calculations, report, and proposed testimony improperly calculating past and future wage loss should be excluded from the bench trial of this matter.

Respectfully submitted,

*/s/ Jefferson R. Tillery*

JEFFERSON R. TILLERY (La. Bar No. 17831)
SARA B. KUEBEL (La. Bar No. 38305)
JONES WALKER, LLP
201 St. Charles Avenue – 48th Floor
New Orleans, Louisiana 70170-5100
Telephone: (504) 582-8616
Facsimile: (504) 589-8616
Email: jtillery@joneswalker.com
skuebel@joneswalker.com

***Attorneys for Defendant, Marquette Transportation Company Gulf-Inland, LLC***